[No. 29683-1-III.    Division Three.    April 12, 2012.]

PATRICK H. KOFMEHL, *Respondent*, v. BASELINE LAKE, LLC, *Appellant*.

*George M. Ahrend* (of *Ahrend Law Firm PLLC*), for appellant.

*Michael R. Tucker* (of *Dunn & Black PS*), for respondent.

¶1 SIDDOWAY, A.C.J. — When a purchase and sale agreement is determined to be void under the statute of frauds, the court may grant rescission and award restitution, restoring the parties to their precontractual positions. But a

purchaser who relies on the statute of frauds to avoid the contract may not obtain restitution if the vendor is ready, willing, and able to perform as agreed. *Home Realty Lynnwood, Inc. v. Walsh*, 146 Wn. App. 231, 240, 189 P.3d 253 (2008). This appeal requires that we address an issue not explicitly addressed in prior cases applying this rule, namely, who bears the burden of proof of establishing whether the vendor is ready, willing, and able to perform? We hold that establishing that the vendor was not ready, willing, and able to perform is an essential part of the vendee's proof of a right to restitution. Because the trial court erred in imposing the burden on the vendor, we reverse its orders granting summary judgment and attorney fees to Patrick Kofmehl and remand the case for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

¶2 At issue in this case is a portion of a parcel of real property now located in Quincy, Washington, following its annexation in 2007. The full parcel consists of approximately 43 acres described as farm unit (FU) 182, block 73, in Grant County. In January 2007, Baseline Lake LLC, the owner of the property, entered into a listing agreement to sell up to 30.12 acres, for which its asking price was $1.6 million. In listing the property it indicated its willingness to sell the 30.12 acres in smaller parcels of 17.40 acres and 12.72 acres at prorated prices. It withheld the remaining 13 acres from the listing, intending to build a private school on a 3.93-acre parcel in the northwest corner. It had no immediate plans for the south 9.04 acres of the property, which is subject to an easement for an irrigation canal.

¶3 Patrick Kofmehl was one of the parties interested in the listed property; he hoped to acquire it for residential development. Before entering into the agreement that is the subject matter of this dispute, Mr. Kofmehl and his broker, Michael Nicholson, were provided with a survey map that

depicted the entire 43 acres owned by Baseline. The survey, to which Mr. Nicholson added the highlighted border, depicted the portions of FU 182 as follows:

Clerk's Papers (CP) at 107.

¶4 On March 9, 2007, Mr. Kofmehl executed a proposed real estate purchase and sale agreement by which he offered Baseline $1.5 million for property that his proposed purchase and sale agreement described as follows:

> This Agreement covers the following described real estate in the City of Quincy, County of Grant, Washington; commonly known as Approximately 30.12 acres of vacant land situated between 10th Avenue & 13th and legally described as follows: all inside and a part of FU 182, Block 73, Columbia Basin Project, Grant County Tax Parcel number 20-0838-000.

CP at 84 (parentheticals omitted). The March 2007 proposed purchase and sale agreement stated that the offer was subject to the following terms and conditions:

1. Review & approval of the property and [its] lot lines by the purchaser within two weeks of acceptance of this offer by the seller.

2. Final annexation into the City of Quincy by the City of Quincy.

3. Seller agrees to pay to purchaser "late comer fees" of $29,475.00 to the purchase if seller chooses to develop the 3.93 acres he has excluded from the overall parcel number shown above.

5 [sic]. If seller decides not to develop the 3.93 acres he will give this purchaser a 45-day (after seller decides not to develop the 3.93 acres) right of first refusal on that land at a price equal to what the purchaser is paying per square foot for the 30.12 acres included in this offer.

*Id.* The offer was not accepted. Given market conditions at the time and competing offers for the property, Baseline amended its listing agreement on March 20, 2007 to increase the asking price to $1.65 million.

¶5 After further offers, Mr. Kofmehl and Baseline entered into a purchase and sale agreement on April 17, 2007 (Agreement), by which Mr. Kofmehl agreed to purchase the property at the asking price of $1.65 million. The Agreement was prepared for the most part by Mr. Kofmehl's broker, Mr. Nicholson, who added typewritten terms to a form real estate purchase and sale agreement. Mr. Kofmehl added one handwritten condition of his own before the Agreement was presented to and accepted by Baseline.

¶6 The provision of the Agreement describing the real estate covered by the Agreement was not identical to the description of the real estate covered by the March 7 purchase and sale proposal. Instead of speaking of 30.12 acres *"all inside and a part of FU 182, Block 73"* it described the property as follows:

Approximately 30.12 acres of vacant land situated between 10th Avenue and 13th and legally described as follows: *All included inside of FU 182, Block 73*, Columbia Basin Project, Grant CO Tax Parcel # 20-0838-000.

CP at 75. The terms and conditions of the March 7 purchase and sale proposal dealing with the 3.93 acres in the northwest corner (addressing Baseline's future development or decision not to develop that parcel) were dropped.

¶7 In addition to including the property description, Mr. Nicholson added the following typewritten terms and conditions to the Agreement:

$50,000.00    Earnest money as shown above in the form of a check to be deposited with [Baseline's broker's] Trust Account upon mutual acceptance of this agreement. Said Earnest money to become non-refundable upon Final annexation of this property into the City of Quincy, Washington and is to be released to the seller at that time.

$1,600,000.00    Additional cash at closing.

Offer to purchase subject to the following terms and conditions:

1. Purchaser receiving preliminary plat approval from the City of Quincy.

2. Purchaser closing this sale within five business days after preliminary plat approval from the City of Quincy.

3. Both purchaser & seller may participate in a 1031 exchange at no cost to the nonparticipating party.

*Id.* Mr. Kofmehl added the following handwritten paragraph to the terms and conditions included by his broker:

4. Accessibility of City sewer.

*Id.*

¶8 Baseline obtained annexation and preliminary approval of its short plat within a month after the Agreement was signed. On May 8, 2007, Baseline's broker, Curt Morris, faxed confirmation of annexation and preliminary approval to Mr. Nicholson as support for release of the $50,000 earnest money. Mr. Morris's transmittal of the proposed short plat stated:

DONE!

Let's go to phase II.

I shall have the letter from the City this week satisfying item # 4. Earnest money to be deposited May 9th. I'll get title report coming.

Any help I can give in regards to this plat let me know but it should be all engineering from now.

CP at 352. The proposed short plat forwarded to Mr. Nicholson identified the 30.12 acres depicted on the earlier-provided survey map as 12.72-acre and 17.40-acre parcels as a unitary "Lot 1." CP at 353. The excluded northwest 3.93 acres and southern 9.07 acres were now depicted as "Lot 2" and "Lot 3," respectively. *Id.* Other than those revised identifications, the depiction of the northwest 3.93 acres, the southern 9.07 acres, and the 30.12 acres offered for sale was virtually identical, if not identical, to the survey map originally provided.

¶9 In light of the annexation, Mr. Morris released the earnest money deposit to Baseline on May 9 as advised in his May 8 transmittal. Mr. Kofmehl raised no objection at that time.

¶10 Also on May 9, 2007, the mayor of Quincy provided Mr. Morris with a letter referencing "Sewer Availability," which stated:

In response to your question this morning, May 9, 2007, you asked about the availability of sewer for the property recently annexed to the City and referred to as Baseline Lake, LLC Annexation lying east of County Road R NW and south of Lauzier Park. This property could be served either north or east subject to engineering.

The City would be happy to assist a developer in planning of sewer service to this Property. If you have any other concerns please contact the City.

CP at 334.

¶11 The Agreement included a closing date of April 15, 2008, almost a year out. On April 13 or 14, 2008, the parties extended the closing date by 45 days. Their addendum

carried forward the description of the property contained in the Agreement and stated:

> Both parties to this agreement hereby agree to extend the closing date to June 1, 2008 (45 days) so that they can complete the negotiations regarding sewer & water cost sharing and any other negotiations regarding the 3.93 acres that the seller wants to build a private school on.

CP at 78. Baseline alleges that the "negotiations" referred to by the addendum were with a view to Mr. Kofmehl purchasing Lot 2 in addition to Lot 1 or, if not, to possible cost sharing by the parties in bringing water and sewer to their respective properties. The closing date was extended again, to July 1, 2008, by a second addendum entered into in late May 2008. The description of the property in the second addendum, including the prefatory language, "[a]pproximately 30.12 acres of vacant land," remained unchanged.

¶12 By a date at least several months earlier, in late January 2008, Mr. Nicholson's communications with Mr. Kofmehl reveal that they foresaw the possibility of a legal dispute over sewer accessibility and the northwest 3.93 acres. One of Mr. Nicholson's communications stated:

> If we are going to get Warren [Morgan, an owner and the managing member of Baseline] and the City of Quincy to pay for [delivery of water and sewer to the site] then we should have some idea of [its] cost because they believe that they never promised the sewer and water would be available to the property line just that the negotiations were subject to the city sewer being accessable [sic]. I know that you anticipate that issue possibly having to be clarified in court together with the 3.93 acres held out for Warren's school.

CP at 374.[1]

---

[1] The record also includes an unsigned September 5, 2007 letter from Mr. Kofmehl to Mr. Morris stating that Mr. Kofmehl had been surprised to learn from Mr. Nicholson that Mr. Morgan did not consider the northwest 3.93 acres of FU 182 to be a part of the property being purchased and sold. The letter also alluded to a misunderstanding over water and concluded that "I have no more means in which to reconcile this purchase agreement other then [sic] to return the land back

¶13 In the week before the final closing date, Mr. Kofmehl e-mailed Mr. Nicholson to confirm that he was ready, willing, and able to close on the Quincy residential property "based upon the terms and conditions of our agreement, dated April 13, 2007." CP at 614. The closing documents described the real property being purchased as "Lot 1, Baseline Short Plat, according to the Short Plat thereof recorded in Volume 21 of Short Plats, pages 55 and 56, records of Grant County, WA" based on a short plat for the property that Baseline had recorded on the day before the closing. CP at 637 (statutory warranty deed). The final short plat depicted the 30.12 acres as Lot 1 and the 3.93 acres as Lot 2, as had the preliminary plat over a year earlier.

¶14 On July 1, 2008, Mr. Kofmehl traveled to the title company with the stated purpose of closing. Once there, and having reviewed the closing documents, he refused to close. Instead, his lawyer telephoned Baseline's broker to report a dispute over what had been agreed. Mr. Kofmehl's lawyer followed up with a letter a few days later in which he summarized Mr. Kofmehl's position as follows:

> Pat has specifically directed me to advise that as was the case o[n] July 1, 2008, he remains ready, willing and able to proceed with the closing of the property provided that the land conveyed includes the "excluded" 3.93 acres listed on the map which is attached to the initial offer, and which is now referred to as Lot 2 on the short plat which was recorded on June 30, 2008. Further, until such time as the issue of the "accessibility of city sewer" has been definitively resolved, the Seller has not met his responsibility of satisfaction of that precondition. Absent the Seller[']s ability to do so, the Seller has not met the pre-requirement and Pat is not compelled to go forward with the closing.

CP at 1308.

---

to Mr. Morgan and to recover my costs." CP at 349. The record indicates that the unsigned copy was obtained by Baseline in discovery from Mr. Nicholson. There is no indication in the record, nor does Mr. Kofmehl argue, that the letter was ever signed and sent.

¶15 Both parties thereafter brought suit, ultimately consolidated into the action below. Mr. Kofmehl asserted claims for breach of contract, misrepresentation, and promissory estoppel, and "alternate" claims of unilateral mistake, mutual mistake, rescission, and quantum meruit (restitution). Baseline sought specific performance of the Agreement. Mr. Kofmehl asserted the statute of frauds as an affirmative defense to what became Baseline's counterclaim.

¶16 In response to a first set of cross motions for summary judgment, the trial court determined that the Agreement and its addenda did not satisfy the statute of frauds and dismissed Baseline's counterclaim for specific performance or damages.

¶17 Mr. Kofmehl had also moved for summary judgment granting rescission, arguing that there was no meeting of the minds as to what property was subject to the Agreement, but he withdrew that argument before the hearing. In granting Mr. Kofmehl's first motion for summary judgment, the court noted that its decision on the statute of frauds did not mean that Baseline was not entitled to keep the $50,000 earnest money.

¶18 The parties had conducted discovery by this time and had arrived at clear and conflicting positions as to the meaning of the Agreement. Baseline's position was that they had agreed to the purchase and sale of only the 30.12 acres platted as Lot 1. It contended that Mr. Kofmehl's present interpretation is revisionist history, adopted by Mr. Kofmehl to avoid having to pay the agreed price in light of a sharp deterioration in the market for residential property in Quincy after the Agreement was signed. In support of its position it relied, among other evidence, on deposition testimony from Mr. Nicholson. Deposition exhibit 23, to which Mr. Nicholson refers in the following testimony, was the survey map (the depiction of the property set forth above):

Q. Who drafted the agreement?

A. I did anything that was typed.

Q. The legal description, you typed that?

A. Yes.

Q. Did you copy that from prior offers that had been exchanged between the parties?

A. No.

Q. Where did you get the legal description?

A. I remember having to create this legal description from the Listing Agreement. There was no exact legal description other than the parcel number that you'll see on here. I was trying to define what it was that—to coordinate with these two pieces on the Listing Agreement. I added the two separate parcels, 1 and 2, price up—to come up with the price—and I added the—well, this proves that I had this somewhere along the line. I added [the] 17.4 and 12.72 descriptions on this map to come up with the 30.12 acres.

Q. And so you were looking at the map that we've marked as Exhibit Number?

A. 23.

Q. 23?

A. 23.

Q. Okay. And you intended by this legal description to include all of the property that was outlined on this map?

A. That's why I outlined it, yes.

Q. And you intended the legal description to exclude the 3.93 acres in the corner of this property?

A. Yes.

Q. And you intended the legal description to exclude the— well, it's the south portion of the property that's covered with irrigation—or, canal easements?

A. Yes.

. . . .

Q. Did you tell Pat Kofmehl what property he was offering to buy?

A. Yes. Yes.

CP at 464-65. Baseline maintained that it had satisfied the condition of access to sewer through annexation and confirmation by the city of easements by which Mr. Kofmehl could connect. It also relied on a letter obtained by Mr. Morgan from the Quincy city administrator after the dispute became clear; that letter provided information on the preexisting easement by which the property could be connected to existing sewer lines and referred the parties to the easement document.

¶19 Mr. Kofmehl's position was that the change in the property's description and the increase in the purchase price between the March 9 proposed purchase and sale agreement and the Agreement were for the purpose, and had the effect, of including the northwest 3.93 acres in the purchase; he alleged that Baseline improperly excluded Lot 2 at closing. He also contended that Baseline failed to satisfy the sewer accessibility condition, which, according to him, required Baseline to cause sewer and water lines to be constructed to the property line. He addressed the testimony of Mr. Nicholson that was relied upon by Baseline with a clarifying declaration from Mr. Nicholson, who testified that Baseline misconstrued the deposition testimony and that he was referring to Mr. Kofmehl's March 9 proposed purchase and sale agreement in testifying that Lot 2 was excluded.

¶20 The parties again filed cross motions for summary judgment, this time on Mr. Kofmehl's claims for rescission and restitution. At the time of hearing, the trial court stated:

It seems to me that both parties share responsibility for attempting to enter a contract and doing it in a way that rendered their attempt void. And that no matter how I turn from side to side or top to bottom the defendant's present argument, Baseline's present argument [that it was ready, willing, and able to perform as agreed], it always seems to me to return to an issue of asking the court to decide which of them was right and which of them was wrong. And I believe the court

has already made it clear that under this factual scenario, the court cannot determine who was right and who was wrong in regard to the contract that they attempted to form.

Report of Proceedings (Oct. 12, 2010) at 26. The court accepted Mr. Kofmehl's argument that Baseline bore the burden of proving the parties' agreement and, if the parties disagreed, then Mr. Kofmehl was entitled to judgment in his favor on the basis of the burden of proof alone. The court granted Mr. Kofmehl's motion, denied Baseline's cross motion, and ordered restitution in the amount of $87,842.78, attorney fees, and costs in favor of Mr. Kofmehl.

¶21 Baseline appeals the trial court's grant of summary judgment awarding rescission and restitution to Mr. Kofmehl and denying its cross motion. It asks that we reverse the trial court's orders and direct it to enter summary judgment in its favor.

## ANALYSIS

¶22 The assignments of error and issues identified by the parties require that we first address the following issues: (1) Who bears the burden of demonstrating whether the vendor was ready, willing, and able to perform as agreed and (2) did the court err in granting summary judgment to Mr. Kofmehl? We address the issues in turn.

### I

¶23 "Every conveyance of real estate, or any interest therein, and every contract creating or evidencing any encumbrance upon real estate, shall be by deed." RCW 64.04.010. Every deed "shall be in writing, signed by the party bound thereby, and acknowledged." RCW 64.04.020. It is the unusually strict but well-settled rule in Washington that to comply with these statutes, real estate subject to a conveyance must be described in sufficient detail that the court is not compelled to resort to extrinsic evidence in order

to find out what was in the minds of the contracting parties. *Martin v. Seigel*, 35 Wn.2d 223, 228, 212 P.2d 107 (1949); *Key Design, Inc. v. Moser*, 138 Wn.2d 875, 883-84, 983 P.2d 653, 993 P.2d 900 (1999). A purchase and sale agreement that fails to comply with the statute's requirements is unenforceable. *Home Realty*, 146 Wn. App. at 241. Both parties acknowledge that the Agreement insufficiently described the subject property and thereby failed to comply with the statute of frauds. The trial court properly determined in response to the first round of cross motions for summary judgment that Mr. Kofmehl asserted a valid affirmative defense to Baseline's claim for specific performance.

■ ■ ¶24 Nonetheless, Washington law is well settled that " 'a vendee under an agreement for the sale and purchase of property which does not satisfy the statute of frauds, cannot recover payments made upon the purchase price if the vendor has not repudiated the contract but is ready, willing, and able to perform in accordance therewith, even though the contract is not enforceable against the vendee either at law or in equity.' " *Schweiter v. Halsey*, 57 Wn.2d 707, 711, 359 P.2d 821 (1961) (quoting *Dubke v. Kassa*, 29 Wn.2d 486, 487, 187 P.2d 611 (1947)). Washington courts have "consistently denied" recovery of earnest money paid under such circumstances, "in accord with the great weight of authority." *Id.* at 712; *Home Realty*, 146 Wn. App. 231.

¶25 The issue of the vendor's willingness to perform arises when the vendee seeks rescission and restitution, which were Mr. Kofmehl's claims at issue in the second round of summary judgment motions. While Mr. Kofmehl suggests on appeal that the claims are distinct, Washington decisions generally treat rescission and restitution as operating in tandem to produce the remedy that Mr. Kofmehl seeks: an unwinding of the contract together with an award of whatever damages are required to restore the parties to their prior positions. *E.g.*, *Home Realty*, 146 Wn. App. at 235, 239-40; *Watson v. Yasunaga*, 73 Wn.2d 325, 327, 438 P.2d 607 (1968); *Gillmore v. Green*, 39 Wn.2d 431, 438, 235

P.2d 998 (1951). "A rescission is an avoidance of a transaction [and] will normally be accompanied by restitution on both sides. Rescission is thus less a remedy and more a matter of the conceptual apparatus that leads to the remedy." 1 DAN B. DOBBS, LAW OF REMEDIES: DAMAGES-EQUITY-RESTITUTION § 4.3(6), at 614 (2d ed. 1993).

¶26 While historically understood as an equity action, restitution has its roots in both equity and the law. *Nelson v. Appleway Chevrolet, Inc.*, 160 Wn.2d 173, 187, 157 P.3d 847 (2007) (citing RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 1 cmt. b (Discussion Draft 2000[2])). The justification for restitution is no longer based on a moral judgment as to what is required by " 'natural justice and equity' " but instead on a contention that the defendant has no adequate legal basis for retaining the benefit. *Id.* at 187 n.13 (quoting *Moses v. Macferlan*, (1760) 97 Eng. Rep. 676, 681 (K.B.)). As explained in the comments to the *Restatement*:

> The concern of restitution is not, in fact, with unjust enrichment in any such broad sense, but with a narrower set of circumstances giving rise to what might more appropriately be called *unjustified enrichment.* Compared to the open-ended implications of the term "unjust enrichment," instances of unjustified enrichment are both predictable and objectively determined, because the justification in question is not moral but legal. Unjustified enrichment is enrichment that lacks an adequate legal basis; it results from a transaction that the law treats as ineffective to work a conclusive alteration in ownership rights.

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 1 cmt. b (2011). In *Davenport v. Washington Education Ass'n*, the court observed that "[o]ne person 'enriches' another merely by transferring money or other benefit to the other. But a transferee who receives money or other benefit is not

---

[2] The third *Restatement*, while in draft form when *Nelson* was decided, was adopted in 2011. Its § 1 and cmt. b continue to support the position adopted by the court in *Nelson*.

liable for restitution unless 'the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him [or her] to retain it.' " 147 Wn. App. 704, 727-28, 197 P.3d 686 (2008) (second alteration in original) (footnote omitted) (quoting *Chandler v. Wash. Toll Bridge Auth.*, 17 Wn.2d 591, 601, 137 P.2d 97 (1943)), *review granted*, 166 Wn.2d 1005 (2009), *and dismissed*, No. 82615-3 (Wash. May 4, 2010).

¶27 In assessing whether it is unjust for Baseline to retain the earnest money deposited by Mr. Kofmehl and disbursed to it according to the Agreement's terms, the "predictable and objectively determined" legal justification that would support Baseline retaining the earnest money is necessarily the rule recognized in the 106-year-old line of Washington cases beginning with *Johnson v. Puget Mill Co.*, 28 Wash. 515, 68 P. 867 (1902) and most recently expressed in *Home Realty*: that a vendor is entitled to retain the deposit if it is ready, willing, and able to perform as agreed and it is the purchaser who refuses to perform by setting up the statute against the vendor. *Home Realty*, 146 Wn. App. at 240. Without establishing the vendor's repudiation or failure to perform, the vendee has not shown that the vendor was "unjustifiably" enriched. *Accord Gillmore*, 39 Wn.2d at 437 (allocating burden of proof to vendee where a real estate contract was at issue).

¶28 Mr. Kofmehl nonetheless argues that *Hornback v. Wentworth*, 132 Wn. App. 504, 513, 132 P.3d 778 (2006), *review granted*, 158 Wn.2d 1025 (2007), *and dismissed*, No. 78707-7 (Wash. May 17, 2007) states the general rule that "[v]oid or illegal real estate contracts create a common law right of rescission" and that the limitation on rescission and restitution provided by cases such as *Home Realty* is a narrow exception. But neither *Hornback* nor *Gilmore v. Hershaw*, 83 Wn.2d 701, 521 P.2d 934 (1974), on which *Hornback* relies for the stated proposition, involved a void or illegal real estate contract. *See Hornback*, 132 Wn. App. at 509 ("the parties' contract was not in violation . . . at the

time it was entered"); *Gilmore*, 83 Wn.2d at 704 (statute cited by vendee did not make the sale of land "void or illegal"). *Hornback* involved a contract legal at its inception that was frustrated by supervening illegality; accordingly, as a matter of contract law, not common law, restitution was available. 132 Wn. App. at 513; *see Chem. Bank v. Wash. Pub. Power Supply Sys.*, 102 Wn.2d 874, 934, 691 P.2d 524 (1984) (quoting *Restatement (Second) of Contracts* § 272 (1981) for the availability of restitution), *cert. denied*, 471 U.S. 1065, 1075 (1985). The *Gilmore* court was never required to reach the remedy for a void or illegal contract; it accepted the appellants' position that common law rescission would be available in that event, but without analysis. 83 Wn.2d at 703. *Hornback* appears to have discussed void and illegal contracts as an analogous aside. 132 Wn. App. at 513. The proposition for which Mr. Kofmehl cites *Hornback* is dicta in both cases and need not be examined further.

¶29  Mr. Kofmehl also points to *Home Realty* as implying that the vendor bears the burden of proof, pointing to the court's statements that the "[vendors] are unable to point to anything in the record demonstrating that they met this standard" and "[t]he record before us is devoid of conclusive evidence that the [vendors] remained ready, willing, and able to perform." 146 Wn. App. at 241. Baseline responds with the countervailing implication of the statement in *Johnson* that "[t]here is no proof whatever that the [vendor] was not at all times . . . able, ready, and willing to fully perform . . . and there is no proof that the [vendee] ever offered to make further payments as required by the contract." 28 Wash. at 521. It also cites *Browne v. Anderson*, 36 Wn.2d 321, 217 P.2d 787 (1950), which denied a vendee's recovery without any express finding on the vendor's willingness and ability to perform; from that, Baseline argues that the court's silence is best explained by the rule that the absence of a finding is deemed a negative finding against the party having the burden of proof. Br. of Appellant at 21. None of these decisions directly address the burden of proof.

Given the distinct possibility that the court uncritically accepted a shared position of the parties or made the statements on which Mr. Kofmehl and Baseline rely without considering the ramifications for the issue raised here, we find none of the language cited from these cases to be persuasive.

¶30 The allocation of the burden of proof follows naturally from the fact that Mr. Kofmehl is the party seeking restitution and must therefore prove that Baseline is unjustly enriched by retaining the earnest money. Establishing that Baseline was not ready, willing, and able to perform as agreed is a necessary element of Mr. Kofmehl's claim.

## II

¶31 Having determined that Mr. Kofmehl bears the burden of proving that Baseline was not willing to perform as agreed, we address whether summary judgment was appropriately granted in his favor. We review an order granting summary judgment de novo. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). Summary judgment is proper if no genuine issue of material fact remains and the moving party is entitled to a judgment as a matter of law. CR 56(c).

¶32 When reviewing a summary judgment order involving a heightened burden of proof, as is the case here,[3] this court "must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Burton v. Twin Commander Aircraft, LLC*, 171 Wn.2d 204, 223 n.8, 254 P.3d 778 (2011). Thus, we must determine whether, viewing the evidence in the light most favorable to Baseline, a rational trier of fact could find that Mr. Kofmehl supported his claim for restitution with

---

[3] The parties agreed that a heightened standard of clear and convincing evidence applies. Br. of Appellant at 23-24; Br. of Resp't at 16, 24. We assume, without deciding, that it applies.

clear, cogent, and convincing evidence. *Woody v. Stapp*, 146 Wn. App. 16, 22, 189 P.3d 807 (2008).

¶33 Mr. Kofmehl argues that he established a right to restitution by demonstrating that the parties claim different understandings of the Agreement—that alone demonstrates that Baseline was unwilling to perform as agreed, or at least as agreed by Mr. Kofmehl. He persuaded the trial court that the parties' disagreement and Baseline's asserted burden of proof, without more, entitled him to summary judgment. Mr. Kofmehl's argument to this end sometimes resembles the alternative theory he argued in support of summary judgment but then withdrew: that no contract was formed because there was no meeting of the minds. But we can see from the record on appeal that lack of mutual assent is itself disputed. To rely on a lack of mutual assent for a restitutionary remedy, Mr. Kofmehl would have to prove there was no meeting of the minds.[4] If shown, it would be a basis for a different restitution claim.[5] Whether there is a meeting of the minds is determined by the objective manifestations of the parties. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005).

¶34 But no motion for summary judgment on mutual assent was submitted for decision below, so no issue of mutual assent is before us on appeal. We are presented instead with restitution predicated on the Agreement's violation of the statute of frauds, something that Mr. Kofmehl *has* established. To demonstrate that Baseline's retention of the earnest money was unjust, he must prove that Baseline was unwilling to perform its obligations

---

[4] While the issue ordinarily arises as a defense to enforcement, Mr. Kofmehl prevented enforcement by raising the statute of frauds.

[5] The *Restatement* suggests that "if a purported agreement proves after performance to be unenforceable because of a defect in contract formation—with the result that the claimant has performed in the mistaken belief that a contract exists when in fact it does not—the resulting restitution claim is generally regarded as one for benefits conferred by mistake. *See* § 9, Comment *f.*" RESTATEMENT (THIRD) OF RESTITUTION § 31 cmt. a.

under the Agreement. Establishing the meaning of the Agreement is an essential part of his proof.

¶35 Given the meaning of the Agreement advanced by Mr. Kofmehl, he understandably supported his motion for summary judgment for restitution with declarations seeking to establish that the Agreement includes the 34.05 acres later identified in the short plat application as Lots 1 and 2, and that the condition of the Agreement providing for "accessibility of sewer" meant that Baseline would cause water and sewer lines to be extended to the property. With the Agreement thus understood, Mr. Kofmehl argues that Baseline failed and refused to perform.

¶36 Baseline responded with evidence that the parties instead agreed to the purchase and sale of only the 30.12 acres ultimately platted as Lot 1. Its evidence included its broker's and principal's testimony that the property offered was limited to that platted as Lot 1; the listing agreement excluding the 3.93 acres in the northwest corner; the survey map excluding the 3.93 acres in the northwest corner; Mr. Kofmehl's proposed purchase and sale agreements and the Agreement, all describing the property as consisting of 30.12 acres; contemporaneous profit projections by Mr. Kofmehl premised on development of only 30.12 acres; and the deposition testimony of Mr. Nicholson that he prepared the description of the property with the intention of excluding the northwest 3.93 acres, an offer he explained to Mr. Kofmehl. We need not consider Mr. Nicholson's clarifying affidavit asserting that his deposition testimony has been misunderstood. His explanation that he was only describing Mr. Kofmehl's first offer contradicts questions and answers that Baseline has demonstrated repeatedly and clearly tied his testimony to the Agreement. *See Jones v. State*, 170 Wn.2d 338, 370, 242 P.3d 825 (2010) (" 'When a party has given clear answers to unambiguous . . . questions [in a deposition] which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit

that merely contradicts, without explanation, previously given clear testimony.' " (alterations in original) (internal quotation marks omitted) (quoting *Marshall v. AC&S, Inc.*, 56 Wn. App. 181, 185, 782 P.2d 1107 (1989))).

¶37 With respect to the condition "accessibility of sewer," Baseline presented declarations showing that the subject property was annexed by the city of Quincy and confirmation by city officials that there are easements in place to provide for sewer to the property. The city administrator identified the course of the easement. Baseline procured and provided a copy of the underlying easement document.

¶38 Viewing the summary judgment record in the light most favorable to Baseline, Mr. Kofmehl demonstrated that Baseline refused to perform the terms of the Agreement as *he* interprets those terms, but he did not demonstrate that the Agreement should be interpreted, as a matter of law, to have the meaning he advances. Summary judgment in Mr. Kofmehl's favor was improper.

¶39 We reverse the trial court's order granting summary judgment in favor of Mr. Kofmehl, reverse the trial court's orders of restitution and attorney fees, and remand for further proceedings consistent with this opinion.

¶40 The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions. RCW 2.06.040.

BROWN and KULIK, JJ., concur.

Review granted at 175 Wn.2d 1005 (2012).